[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-14767

_____

D.C. Docket No. 7:14-cv-00142-HL

LIBERTY SURPLUS INSURANCE CORPORATION,

Plaintiff–Appellant,

versus

NORFOLK SOUTHERN RAILWAY CO.,

Defendant–Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(April 4, 2017)

Before ROSENBAUM and JULIE CARNES, Circuit Judges, and
SCHLESINGER,[*] District Judge.

_____

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of
Florida, sitting by designation.

SCHLESINGER, District Judge:

Before the Court is, once again, the classic case of the insurer requesting relief from the consequences of the inartfully drafted, yet plain, terms of its insurance policy. Liberty Surplus Insurance Corporation appeals an adverse summary judgment granted by the District Court, which found, among other things, that the Completed Work Exclusion provisions contained within Liberty's insurance agreement did not operate to preclude the insured from coverage. We affirm.

## I.  BACKGROUND[1]

The parties in this appeal are Norfolk Southern Railway Company ("Norfolk Southern"), the insured, and Liberty Surplus Insurance Corporation ("Liberty"), the insurer. On June 1, 2011, a motorist was struck by an oncoming train at a crossing owned by a subsidiary of Norfolk Southern. Her resulting injuries were severe. In 2012, the motorist filed suit against Norfolk Southern and its subsidiary, alleging that, among other things, overgrown and improperly maintained vegetation at the railroad crossing impaired her ability to see an approaching train. In 2013, the motorist amended her complaint to add NaturChem, Inc. ("NaturChem") as a defendant in the litigation.

---

[1] Because the Court reviews the district court's grant of summary judgment, the Court recites facts in this opinion solely for purposes of reviewing the district court's rulings on the proceedings below. These facts are not necessarily the actual facts. *Kelly v. Curtis*, 21 F.3d 1544, 1546 (11th Cir. 1994).

In 2005, NaturChem and Norfolk Southern entered into a Crossing Maintenance Agreement,[2] (the "Crossing Contract"). The parties agree that the Contract was in effect at the time of the motorist's accident. The Crossing Contract provided that NaturChem would apply herbicide to each crossing on Norfolk Southern's Georgia Division a minimum of twice per year. The Contract further required NaturChem to "monitor each of the crossings and perform required maintenance as often as necessary to maintain the crossing appropriately." Additionally, the Crossing Contract obligated NaturChem to purchase a Railroad Liability Policy (the "Policy"). NaturChem purchased the required Policy from Liberty, which was in effect from May 19, 2011, to May 19, 2012.

Upon learning of the motorist's litigation, NaturChem alerted Liberty. Liberty confirmed with Norfolk Southern that it had been sued and desired coverage under the Policy. Under a reservation of rights, Liberty agreed to pay 50% of the total cost of defending the defendants. As the litigation progressed, Liberty became aware of certain facts it believed eliminated coverage under the Policy.

In September, 2014, Liberty filed a Complaint for Declaratory Judgment in the United States District Court for the Middle District of Georgia, and requested the District Court determine its obligations under the Policy. In October 2015,

---

[2] The Agreement is also known to the parties as Crossing Maintenance – GA Division AN4H00.

3

Liberty and Norfolk Southern filed cross motions for summary judgment. One of the arguments made by Liberty in support of its motion was that the motorist's injury was sustained after NaturChem's "work" (as defined by the Policy) had already been completed and was therefore excluded from coverage. The Policy excludes coverage for "Completed Work," which is defined in the Policy as:

> "Bodily injury" or "property damage" occurring after the "work" is completed. The work will be deemed completed at the earliest of the following times:
>
> (1) When all the "work" called for in the "contractor's" contract has been completed.
>
> (2) When all the "work" to be done at the "job location" has been completed.
>
> (3) When that part of the "work" done at the "job location" has been put to its intended use by you, the governmental authority or other contracting party.

Liberty argued that NaturChem completed its herbicide application at the crossing involved on March 3, 2011—90 days prior to the motorist's accident. Thus, according to Liberty, NaturChem's "work" at the "job location" (the crossing) had been returned to its intended use, and subsection (2) or (3) of the Competed Work exclusion applied.

After a hearing, the District Court rejected Liberty's argument and granted summary judgment in favor of Norfolk Southern. It did so on the basis that the term "work" referred to NaturChem's ongoing maintenance and monitoring

4

obligations, not just the herbicide application, which NaturChem had not completed at the time of the motorist's accident.  The only challenge Liberty raises on appeal is whether the District Court's determination that the Policy's Completed Work Exclusion did not apply was incorrect.

## II.  <u>STANDARD OF REVIEW</u>

" 'The interpretation of an insurance contract is a matter of law subject to *de novo* review.' "  *Chalfonte Condo. Apartment Ass'n, Inc. v. QBE Ins. Corp.*, 561 F.3d 1267, 1274 (11th Cir. 2009) (quoting *Admiral Ins. Co. v. Feit Mgmt. Co.*, 321 F.3d 1326, 1328 (11th Cir. 2003)).  "Sitting in diversity, we apply the substantive law of the forum state unless federal constitutional or statutory law compels a contrary result."  *Admiral*, 321 F.3d at 1328.  Accordingly, Georgia substantive law governs our interpretation of the Policy.

In Georgia, insurance "is a matter of contract and the parties to the contract of insurance are bound by its plain and unambiguous terms."  *Hurst v. Grange Mut. Cas. Co.*, 470 S.E.2d 659, 663 (Ga. 1996).  As contracts, insurance agreements "'are governed by the rules of construction applicable to other contracts . . . .'"  *Byrd v. United Servs. Auto. Ass'n.*, 729 S.E.2d 522, 524 (Ga. Ct. App. 2012) (quoting *Cuyler v. Allstate Ins. Co.*, 643 S.E.2d 783, 785 (Ga. Ct. App. 2007)).  "'[C]onstruction of a contract is a question of law for the court.'"  *Id.* (quoting *Cuyler*, 643 S.E.2d at 785).

5

"Words used in the policy are given their usual and common meaning, . . . and the policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." *Ga. Farm Bureau Mut. Ins. Co. v. Smith*, 784 S.E.2d 422, 424 (Ga. 2016) (internal citations and quotation marks omitted). " 'The natural, obvious meaning of a policy provision is to be preferred over any curious, hidden meaning which nothing but the exigency of a hard case and the ingenuity of a trained and acute mind would discover.' " *Auto-Owners Ins. Co. v. Reed*, 649 S.E.2d 843, 844 (Ga. Ct. App. 2007) (quoting *Truitt Oil & Gas Co. v. Rangers Ins. Co.*, 498 S.E.2d 572, 573 (Ga. Ct. App. 1998)). Thus, "where the contractual language is explicit and unambiguous, the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured." *Smith*, 784 S.E.2d at 424 (internal quotation marks omitted).

Any coverage exclusions "must be defined clearly and distinctly." *State Farm Fire & Cas. Co. v. Walnut Ave. Partners, LLC*, 675 S.E.2d 534, 537 (Ga. Ct. App. 2009) (quoting *Hurst*, 470 S.E.2d at 761)). And any "exceptions and exclusions to coverage [will] be 'narrowly and strictly construed against the insurer and [forgivingly] construed in favor of the insured to afford coverage.' " *Auto-Owners Ins. Co. v. Neisler*, 779 S.E.2d 55, 59 (Ga. Ct. App. 2015) (quoting *Ga. Farm Bureau Mut. Ins. Co. v. Meyers*, 548 S.E. 2d 67, 69 (Ga. Ct. App. 2001))

6

(brackets in original). Thus, an unambiguous exclusion "binds the parties to its terms and must be given effect, even if beneficial to the insurer and detrimental to the insured." *Fid. Nat'l Title Ins. Co. of N.Y. v. OHIC Ins. Co.*, 619 S.E.2d 704, 706 (Ga. Ct. App. 2005) (quoting *Manning v. USF&G Ins. Co.*, 589 S.E.2d 687, 688 (Ga. Ct. App. 2003). In short, the Court " 'will not strain to extend coverage where none was contracted or intended.' " *Manning*, 589 S.E. 2d at 688 (quoting *Jefferson Ins. Co of New York v. Dunn*, 496 S.E. 2d 696, 699 (Ga. 1998)).

## III. DISCUSSION

At just over twenty pages, the Policy itself is relatively short and uncomplicated. It provides coverage for "bodily injury" or "property damage" if the claimed injuries arise "out of acts or omissions at the 'job location' which are related to or are in connection with the 'work' described in the Declarations." The "Declarations" section of the Policy describes "work" as comprising the following: "Description of Operation (Work):  Crossing Maintenance – GA Division AN4H00[.]"  "Work" is also defined elsewhere in the Contract, circularly, as "work or operations performed by the 'contractor' including materials, parts or equipment."

Thus, we conclude, as did the District Court, that the Policy defines "work" as it is described in the Crossing Contract. The Crossing Contract's description of work is extensive:

7

## 1. **DESCRIPTION OF WORK**

### 1.1. **Work.**

Contractor shall . . . perform and complete the following work on the GEORGIA Division:

Contractor will provide a Crossing Maintenance program inclusive of herbicides required to maintain acceptable control on the territory covered by this contract. Vegetation will be controlled on all quadrants of the crossings to maintain adequate site distance for the length of this contract.

Contractor will conduct an approved vegetation management program utilizing various methods to control brush and other undesirable vegetation that may obstruct visibility at the designated crossings. The Contractor's chemical program will be designed to promote low growing desirable species in order to establish desirable grasses that will compete with and limit tall growing undesirable species. The chemical program will be designed to eliminate all broad leaf weeds, woody plants, Johnson Grass, herbicide resistant species, and other grasses that could obstruct visibility. The application formula will be specific to the type of brush, weeds, and small trees in each area. Contractor will pay particular attention to difficult species including but not limited to Mimosa, Paradise Trees, Mare's Tail, Johnson Grass, broad leaf weeds, woody plants and other herbicide resistant species.

Contractor will provide maintenance for the areas outlined for each crossing in Appendix B, "Crossings for 2005 Maintenance," spreadsheet included with this Contract. Maintenance will be provided utilizing off track equipment. **Contractor will be responsible for maintenance of each crossing throughout the length of the contract. Contractor will monitor each of the**

8

> **crossings and perform required maintenance as often as necessary to maintain the crossing appropriately.**

(emphasis added).

By its plain language, the Crossing Contract describes—as the District Court found—an ongoing and continuous maintenance and monitoring obligation, rather than a contract for a series of limited and discrete tasks, such as defoliation of vegetation. Liberty acknowledges that this characterization of the Crossing Contract is correct. (*See* Appellant's Br. at 22 n.6 ("Subsection (1) [of the Completed Work Exclusion] focuses on the work 'called for in the contractor's contract,' i.e., *NaturChem's ongoing obligation to monitor vegetation at the crossings*." (emphasis added))). Nevertheless, Liberty argues that the Policy's Completed Work Exclusion operates to remove the claim from coverage.[3]

The Policy's Completed Work Exclusion excludes coverage for:

> "Bodily injury" or "property damage" occurring after the "work" is completed. The work will be deemed completed at the earliest of the following times:
>
> (1) When all the "work" called for in the "contractor's" contract has been completed.
>
> (2) When all the "work" to be done at the "job location" has been completed.

---

[3] On appeal, Liberty does not challenge the District Court's determination that the general terms of the Policy provide coverage for the injuries suffered by the motorist.

9

(3) When that part of the "work" done at the "job location" has been put to its intended use by you, the governmental authority or other contracting party.

Liberty does not dispute, nor could it, that section (1) of the Completed Work Exclusion was not triggered, as the work called for in the Crossing Contract—the continuous duty to maintain and inspect the vegetation—was not complete at the time the motorist was injured.  Instead, Liberty focuses on subsections (2) and (3) of the Exclusion, and insists that the Policy only covers injuries sustained while NaturChem is actively spraying herbicide or performing spot checks at the crossing.  Thus, the argument goes, once NaturChem completed its herbicide application (or spot check) at each crossing, all or part of the "work" to be done at the "job location" was put to its intended use, which in turn triggered the Completed Work Exclusion under either subsection (2) or (3).

The District Court rejected this argument, as do we.  As the District Court correctly explained, "the very essence of the Crossing Contract is for NaturChem to provide ongoing observation and maintenance of each of the railroad crossings listed [in the Crossing Contract,]" for the duration of the Contract period.  Because NaturChem had an ongoing duty to maintain the vegetation at the crossing, the "work" had not been completed or returned to its intended use:

> Work that is essential to the contract and the nonperformance of which would otherwise render the overall project unusable cannot be characterized as

10

> simply service, maintenance, correction, repair, or replacement. Under those circumstances, an insured's operations will not be deemed "complete" even though the insured's work at issue has been substantially completed.

9A Couch on Ins. § 129:26 (3d ed. 2016) (citing *SawHorse, Inc. v. S. Guar. Ins. Co. of Ga.*, 604 S.E.2d 541, 546 (Ga. Ct. App. 2004)). To conclude otherwise would require the Court to read language into the Policy that does not exist. As the District Court reasoned:

> Nowhere in the exclusion is there language explicitly stating that in order for there to be coverage under the Policy, NaturChem's employees must be physically present and working on the tracks. Additionally, that part of the exclusion upon which Liberty relies states that "work" is deemed completed when the "work" at the "job location" has been put to its intended use, not when the "job location" has been put back to use by the railroad as Liberty advocates.

*Liberty Surplus Ins. Corp. v. Norfolk S. Ry. Co.*, No. 7:14-cv-00142-HL (M.D. Ga. June 3, 2016).

Liberty suggests that this interpretation is error in that it "gives no effect to the parties' decision to use a different concept of work in subsections (2) and (3)." Liberty's argument on this point is fatal to its case. "Work" is defined in the Policy as it is described in the Crossing Contract, without any limitation or proviso. Although Liberty insists that subsections (2) and (3) focus on the "work done at the job location," all three subsections set out the term "work" on its own, bounded in

11

its own quotation marks, and without any means of distinguishing one subdivision's "concept" of "work" from any other.

In other words, there is nothing within the language of the Policy, or the Exclusion itself, which suggests distinguishing between "different concepts of work" within the same provision is appropriate. Moreover, even if the Court permits itself to consider evidence outside the four-corners of the Policy, no evidence that the parties contemplated an alternative definition of "work" exists in the record, and Liberty does not suggest otherwise.

As the Court is required to strictly construe exclusions in favor of coverage, the Court is not permitted to adopt Liberty's strained and unnatural construction of the Completed Work Exclusion. *Neisler*, 779 S.E.2d at 59; *see also State Farm*, 675 S.E.2d at 537 (explaining that any coverage exclusions "must be defined clearly and distinctly."); *Smith*, 784 S.E.2d at 424 ("[T]he policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney."). That is, the Court is precluded from reading into the Policy a "curious, hidden meaning which nothing but the exigency of a hard case and the ingenuity of a trained and acute mind would discover." *Reed*, 649 S.E.2d at 844. The Court's job here "is simply to apply the [unambiguous] terms of the contract as written, regardless of whether doing so benefits the carrier or the insured." *Id.*

12

In sum, the plain and unambiguous language of the exclusion requires the Court apply the same definition and concept of "work" to subsections (2) and (3) of the Completed Work Exclusion as Liberty agrees applies to subsection (1). And under that definition—which describes an ongoing inspection and maintenance program—the "work" was neither completed in part, nor put to its intended use. Thus, the Completed Work Exclusion cannot be interpreted as precluding coverage under the circumstances presented in this case.

The cases cited by Liberty do not compel a different result. For instance, Liberty cites *Travelers Ins. Co. v. Ty Co. Servs., Inc.*, 399 S.E.2d 562 (Ga. Ct. App. 1990), as suggesting that "Georgia courts have consistently applied a completed-work exclusion where a contractor has finished a job and the client has put the work to its intended use." However, the insured in *Travelers* was hired specifically to make certain repairs to an irrigation system—that is, the essence of the underlying contract was the performance of a specific task, not an ongoing maintenance obligation. *See Travelers*, 399 S.E.2d at 563.[4] Moreover, the completed-work exclusion in *Travelers* contained a provision which stated, "Operations which may require further service or maintenance work, or correction,

---

[4] The same is also true for the other Georgia cases cited by Liberty. In *Continental Ins. Co. v. Hawkins*, 316 S.E.2d 596 (Ga. Ct. App. 1984), the underlying performance was for the installation of a sprinkler system; *Savannah Laundry & Machine. Co. v. Home Ins. Co.*, 376 S.E.2d 373 (Ga. Ct. App. 1988), involved the installation of a boiler door. None of these cases involve circumstances where the underlying performance is for a continuous maintenance and inspection obligation.

13

repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed." *Id.* No such language is contained in Liberty's Policy.

In the two non-binding cases Liberty relies on—*James v. Hyatt Corp. of Delaware*, 981 F.2d 810 (5th Cir. 1993) (involving a defective escalator), and *Zurich Ins. Co. v. Principal Mut. Ins. Co.*, 761 A.2d 344 (Md. Ct. App. 2000) (a defective elevator), the policy language differed in a material way from the language of the Policy in this case. In both *James* and *Zurich*, one of the exclusion's sub-provisions qualified the term "work" with the parenthetical "(other than service, maintenance or repairs)." In the Policy here, Liberty could have qualified the term "work" in sub-provisions (1), (2), and (3) with the parenthetical "(other than monitoring)," but Liberty did not do so. It must now live with the consequences of its chosen language.

Here, it is indisputable that the "work" contemplated by the Crossing Contract extends, by any reasonable construction, far beyond the mere spot checking or twice-yearly applications of herbicide. It is also indisputable that no language within the Policy limits "work" to anything less than what is described in the Crossing Contract itself. As such, the Completed Work Exclusion does not apply to preclude coverage under these circumstances. If Liberty contemplated narrower coverage than what is apparent from the Policy's language, it was its

14

responsibility to draft the Policy to reflect a narrower scope, which it did not do in this instance.

**AFFIRMED**.